Next case will be In Re Aetna Inc Securities Lit for the plaintiff appellant, Barna. I'd like to reserve three minutes for rebuttal. That's granted. And again, I will ask you to speak as clearly as you can because the third member of the panel is not here. Very good. I just actually raised the microphone. Oh, that's fine. I think that will help a little bit. I have to do that if I'm talking too, so go ahead. This is a securities class action for violations of the securities laws. And at the heart of this case is statements made by the defendants concerning their discipline pricing. And what the allegations in the complaint say is that these statements are false and misleading, where the company says we're adhering to discipline pricing, we have been doing discipline pricing, we adhere to those discipline pricing policies, when in fact the company was underpricing their policies. And what we mean by underpricing. Yeah, how do we know they were underpricing? That's a good question, Your Honor, and there's a few different reasons why we know that. And one of the reasons the lower court did not even look at, and that is the FTN survey. That was a survey that was done by a small Midwestern investment firm where they went out and they interviewed over 100 industry representatives, including benefit consultants and insurance brokers. And they did interviews by phone that lasted about 15 to 20 minutes each. Yeah. And during these interviews, they discovered and the information they got back from these investment brokers and these consultants was that Aetna was pricing their policies, basically low-balling their policies in order to gain membership. Now, how did these people of whom they got this information know? I mean, was there any record of Aetna's that showed that they were, quote, low-balling? Your Honor, well, the FTN survey itself is interviewing people that are in the industry that are dealing with Aetna. So they thought they were competitors? No, no, no. They weren't competitors. They were actually brokers and different individuals that deal with Aetna. Now, how did they know? What facts showed that Aetna was underpricing? Well, if you look at the survey itself, it sort of speaks for itself, but basically what those people were probably looking at. No, no, the survey doesn't speak for itself. The survey shows what other people think. It doesn't show what Aetna was doing. Well, Your Honor, if you basically combine, you take the FTN survey and you say, hey, there was 100 industry, over 100 industry employees that were interviewed that were basically saying that Aetna was underpricing. Lawyers might think that I'm tough, but I'm not really. So what is the hard fact, the objective fact? Well, Your Honor, then you look at the FTN survey, and then you look at that in connection with the confidential witnesses. That's actual employees that were working at Aetna. That also suggests, right, that also suggests, and they were in different parts of the country dealing with different types of insurance for Aetna, all basically saying the same thing, that Aetna is looking to underprice their policies in order to gain the market share. They want to get membership. All right. Assuming that's so, weren't there cautionary statements in the Aetna material? No, because, Your Honor, these statements, you know, the lower court looked at these statements and said these statements about discipline pricing are forward-looking statements. Yeah. Then the court looked at whether there was cautionary language. What we suggest and what we submit to the court is that these statements aren't forward-looking statements. When you're telling the market and you're telling your class member, you're telling your shareholders that you're practicing and you're adhering to your strict discipline pricing, and at the same time you're intentionally low-balling the premiums in order to gain membership at the cost of profitability, that's a false and misleading statement. There are two issues there, I think. One, let's stick to the cautionary statements because you certainly get out if you have adequate cautionary statements, right? We agree as a matter of law that under the law all you have to do is put in cautionary statements, right? If the statements are forward-looking. Now, we say the statements aren't forward-looking. Okay. Well, there's two questions. One is were the statements forward-looking and then were there cautionary statements? Right. What should the cautionary statements have included that they didn't include? That's pretty basic, Your Honor. If the cautionary statements would have said to the market and to the shareholders, listen, we're pricing our policies, we're underpricing our policies, we understand this, we're doing this to gain membership. That's not a cautionary statement. But that's exactly right, Your Honor. That's why the statements – that's why these aren't forward-looking statements because if you're saying you're doing – Wait, wait, wait, wait, wait. I'm sorry. The question is not – what I'm trying to get you to focus on is not whether they were forward-looking statements. Okay. That's a separate issue. Right. I understand. What I'm trying to get to is what should the cautionary – the cautionary statement shouldn't have said – I mean, you're not suggesting it should say, hey, we really are guilty, we really are responsible. I mean, that's not a reasonable expectation. Well, if the cautionary – I understand, Your Honor. If the cautionary statements – I'm giving out a statement. What did it say and what should it have said? Bottom line is the cautionary statement should have said we're underpricing our policies. If they would have said that, the public would have known, hey, you're underpricing your policies. We understand that. You're gaining members, but you're probably going to – that's probably going to be at the detriment to profitability. If they would have said that, that would have been fine. People would have understood. Okay. So you want us to write an opinion that says that a cautionary statement should say we were underpricing our policies. Right. You want us to do that. That's exactly what they were doing. Okay. And not telling the public about it. All right. And then everything flows from there because if they're underpricing their policies and they're saying that they're practicing strict discipline pricing, and then in April of 2006 information comes out to the marketplace that, in fact, their MCR, which is affected by low-balling premiums, is much higher, and then the results of this FTN survey come out that say, hey, they're underpricing their policies. That's when the stock reacts. Now, what is different in this case than in Avaya, another opinion that was written by our chief judge, which held that statements like we are on track to meet our goals for the year, even though some aspects to our performance are below our expectations, that was held to be a forward-looking statement. Right, Your Honor. If you compare those statements, and actually Avaya is helpful in a couple different ways. If you look at first the statements, right, on track and position us, the court in Avaya said, yes, those are forward-looking statements. What we have here that's different is we have statements that say we have, we continue to adhere. Our pricing discipline is unchanged. Okay. What's changing in our case, which wasn't happening in the Avaya case, is that they're intentionally underpricing their policies. So that's the big difference. So when you're intentionally underpricing your policies, and at the same time saying our pricing discipline is unchanged, that's a false misleading statement. What's interesting actually in the Avaya case is that later on in the opinion, they do find certain statements to be false misleading, and those are the statements where the company is denying that there are steep discounts in the marketplace, that they're discounting their product. And basically what the court holds there is the company is coming out at different times in that case and saying, hey, we're not discounting, we're not having deep discounts, we're not, there is no steep discounts. And then what the court says is, in fact, there is allegations in the complaint that suggest there was steep discounts. So there they found those statements to be false misleading. You're talking about Avaya. Yeah, and I think that's analogous to our case where you're saying you're practicing discipline pricing, but in fact, at the same time, what we allege in the complaint and what the court has to accept as true for pleading purposes is that they're underpricing their policies. But pleading now is a different ballgame ever since the Supreme Court's decision in, say, Iqbal, and that should apply here too, right? It's a retroactive decision. We have to examine the language of the complaint under the standards that the Supreme Court has now set forth. Do you agree with that? I agree with that, Your Honor. In Intel Labs, the court suggests that if the allegations of the complaint are at least as compelling and cogent as any inference that can be drawn from the defendants or from another perspective, then you're okay. So basically, if it's a 50 percent, if it's a tie, you win. I mean, I suggest in this case we're way above 50 percent here. What do you point to to show that Aetna's pricing policy did, in fact, change? Again, we go back to the CWs, the FTN survey, the company's own admissions that at the end of 05 into 06, their membership rolls went up like 600,000 or approximately 600,000. It was like 563,000. At the same time, two of their big competitors, their membership rolls went down by close to like 200,000. So if you're a shareholder and you're looking at Aetna and you're saying, wow, Aetna is increasing their membership rolls, you know, five times or ten times as great as its rivals, you would think that Aetna's doing pretty good. But then lo and behold, in April, when they come out and say, hey, our MCR numbers are much higher, you know, it doesn't make sense. It shows that, in fact, they weren't doing better. Even though they were getting new members in, they were only getting those new members in by underpricing the policies. Mr. Your Honor, I don't know how much time you have left, but I want you to address the alternative argument I think defendants make. But the other basis for the district court's ruling was the statement on, what is this, 845, right? The district court's decision says, I therefore find these statements to be immaterial and not actionable because they are puffery, vague, and nonspecific expressions of corporate optimism on which reasonable investors would not rely. Right. Right, saying they're not material, so they're not actionable. Yeah. Your Honor, quickly, I know my time's up, but I'd like to respond. No, no, go ahead. We have, you know, there's like 30 inches of snow outside. Very good. We have time to listen. I appreciate it, Your Honor. Thank you very much. There's two responses to that. First is the materiality argument is in the context of, in a lower court decision, the context of the statements being forward-looking. We're suggesting the statements aren't forward-looking. But if you just look at materiality itself. Like in the alternative to forward-looking, like even if they aren't forward-looking, they're not material. Right, right. There's two responses to the materiality argument here, or actually three responses. One is the stock reacts when shareholders believe, the market believes, that Aetna might be doing something that they didn't think they were doing before, and that's underpricing. So if you look at the statements, when the information comes out in April, and the market first begins to learn that, one, the MCR is higher than expected, and, two, the FTN survey comes out that's suggesting that underpricing is going on with Aetna, that the stock reacts by 20 percent, goes down 20 percent. That in itself is materiality. Secondly, with materiality, you have to look at the company's denials throughout the class period. They're questioned quite often by analysts on conference calls about, hey, are you guys sticking to your discipline pricing? Are you guys adhering to this discipline pricing? And they continue to say yes. And then, again, in April, when it comes out that, hey, our MCR is up, the FTN survey is suggesting there's underpricing, the stock goes down. So those are the two main reasons. When did the FTN survey come out? The FTN survey came out to the general public in April of 2006, April 27th of 2006. There's some suggestion that this survey was completed before that time and was available only to paid subscribers of this FTN company. So it was on a very limited publication basis. The lead plaintiff, in this case, never saw the survey until it came out to the general public through the Reuters article in April of 2006. Well, wait a minute. April of 2006 is when it came to the general public? Exactly. There's a Reuters article that talks about the FTN survey. And when was it available to subscribers? I don't know for sure, but it was available to subscribers probably in September, October of 2005, exactly, Your Honor. And was there any market effect? Well, I don't want to put effect in. Was there any market change in 2005 at about the time this came out to subscribers? I say no, and there's nothing alleged in the complaint that suggests that at all, Your Honor. Okay. Go ahead. Do you have more? Nothing else. Thank you very much. Thank you. We'll hear you on rebuttal. Good morning, Your Honor. Michael Carroll from Davis Polk & Wardwell on behalf of Diapolese, Aetna Incorporated, and the four individual charged defendants. Your Honor, if I might, I was going to start right where Your Honor left off with respect to the FTN survey. That survey, FTN is a broker-dealer that puts out analyst reports, and they are in the appendix, that survey is in the appendix that this Court has at page A370 of the appendix, that's Exhibit 22. It's dated September 12, 2005. First of all, it does not say how it's being characterized by the plaintiffs. It's the substance of it. But I wanted to start with Your Honor's question, what was the market reaction? There was no market reaction to this report, and this report we would submit is like any other broker-dealer report that's available to subscribers in an efficient market. I'll stop if you have a question. Thank you. Did somebody in the financial press refer to the FTN survey when it went out to its members? The record that exists before this Court gives us only the survey itself and subsequent press reports to it that came out later. How much later? In the April time period, there were reports that were by Forbes, I think it was, that reported that back earlier in September there had been this report. So this is April of 2006? Correct. When did you say the survey was? I'm sorry. It's September of 2005. Where is it in the report? I'm sorry, Your Honor. It's Exhibit 22, which begins at page A370 of the appendix. A? A is an apple. Oh, I thought you were saying eight, and I didn't have an eight. That's my old Philadelphia accent. Sorry. I probably have it, too. Now, we would submit on this point, and I start here, Your Honor, because I was picking up with the Court's questions. If you go back to the old Burlington decision, there was a piece of the Burlington decision that we think controls on this point, which was there there was disclosure to the market of some information during the alleged period, and there was no market reaction. And I think it was then-judge, now Justice Alito for the Court, wrote that if you're assuming an efficient market for a company, large companies such as Aetna, and the plaintiffs are assuming that, Your Honor, that's the foundation of their case. They have a fraud in the market assumption here. Then what comes with that is the assumption that information that's made available by broker-dealers to paid subscribers or, more generally, is absorbed by the market. And one critical point to note, and this is noted on the survey itself, FTN is a broker, a market maker and broker in Aetna stock. And therefore? And therefore, they are right in the middle of the efficient market for the processing of information. Consistent with that, I'm sorry, Your Honor. Yes, go ahead. Consistent with that, Exhibit 23 in the appendix, which is also here on the record, starts at A3A2, is another research report put out by the same FTN back in November of 2005, Your Honor. And? And what they're doing is recommending buy or sell on the company's stock to their subscribers. Well, isn't the- And they, I'm sorry. They were underpricing. I mean, isn't it? I mean, his whole point, I think, is that they were underpricing and that affects the fraction. Okay. And that they never came clean with that. And as far as I can tell, we don't know whether they were underpricing or not, do we? The only issue is whether the reports they gave out were misleading. I think we know this much after Tellabs and ICBAR. They have fallen far short of any particularized pleading of fact to support an allegation of underpricing as properly understood. Now, disciplined pricing is defined by Aetna because if we just said disciplined pricing, Your Honors might scratch your heads and say, what does that mean? What is disciplined pricing? I think I'm a disciplined lawyer. What would that mean? And Aetna, in its reports that are all part of the appendix, Your Honor, in every press statement, every SEC filing, always said that what disciplined pricing means is we are striving to increase our premiums to keep pace with the projected increases in our medical costs. You know, in a sense now, at least, that's not a forward-looking statement, is it? In the sense that they're telling the market, this is our pricing strategy today. This is what we're doing today. That's not forward-looking. I think it is when the strategy being described is a strategy premised on your future plans. Well, it's not future plans, but they're saying we're doing this today. It's not a future plan. That's the present action. But the present action is premised on your expectation about the future, and that makes it future. Well, it makes it partly in the future, but partly not, you know, in the future. And there, Your Honor, we would go to the Avaya decision out of the Third Circuit by the chief judge that deals precisely with that issue. What do you do if you have a statement that someone could try to pull out a present piece of it and it's wrapped up with a future piece? And I think in the Avaya case, the court noted that the linked, that the trending language there, you couldn't untangle it. No, but Judge Cirica also says in Avaya, a mixed present slash future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present. I agree with that. Right? Of course I agree with that. And I would submit here, Your Honor, you can't pull out a present piece of this and say that it's not bound up in the future for this reason, Your Honor. By definition, for this company, unlike most other companies, it does not know its costs when it's pricing its premiums. They write an insurance policy at the beginning of the year and they're hoping their projections of costs for that year will be less than the premium increase they have charged. Aetna was so careful in all of its public statements to repeatedly not only define it that way, but Your Honor had asked earlier about the cautionary statements. These are the most exacting cautionary statements you could ever hope to see and they warn exactly about this risk. Each time in their site in the appendix, Your Honor, they say, because we price now and the costs don't come in until the future, we are doing it based on a projection of those costs and if we're off on that, it could have an enormous impact on our earnings. They warn that repeatedly. Did you or did anybody do any check when the plaintiffs are talking about the stock market reaction when the FTN survey became public? That was the stock market reaction to Aetna stock. What was happening in the stock market generally? Because it would make a big difference if the entire stock market went comparably down. What's relevant here is they have failed to allege anything. Their complaint is silent on that. And they, of course, after Ickbar and Tellabs If I were the defense lawyer, I would have, if I were Aetna's lawyer, I would have tried to show that the whole stock market went down comparably. Aetna would be much better represented by yourself than by me. Your Honor had asked another question I think is very important, I want to get to it. And that is, at one point you said, where is the facts that you've pled to support the idea that there was a change in pricing practice? And I want to focus on that because in the appellant's brief at page 10, there's a critical paragraph where the appellant concedes that historically, prior to October 2005, it has no evidence that Aetna was underpricing. That is, setting premiums lower than its expected medical costs. It says that prior to October they had touted their disciplined pricing, and then this sentence, indeed at that time, Aetna's insurance policies were profitable and the MCR was stable. Then they say, unbeknownst, beginning in September, defendants started to capture market share by following this new practice. Now, after ICHBAR and TELLABS, you have to have very particularized facts to support. This is just from their brief, of course. So we need to go to their complaint and say, where are the particularized facts that would support any inference, not to mention, Your Honor, the strong inference needed for any finding of Scienter in this case, which applies. Not to mention the strong inference for actual knowledge, which applies if it's a forward-looking statement. And, Your Honor, there's nothing in the complaint. Now, let me show you that, if I may. Your Honor had referred during my worthy adversary's argument to confidential witnesses one through three. There are six of them, and three of them say nothing on the subject at all. The first three are the ones the plaintiff points to support on this statement. But if you look at the allegations in the complaint, none of those confidential witnesses refer to any change in pricing practice by Aetna in September. In fact, two of them say Aetna continued the same practice it had always followed ever since I'd been at the company. That's actually pled by the plaintiffs. And that's completely at odds with the argument their good counsel, trying to hold on to this case, now makes to the court. But, of course, this complaint must be judged based on the allegations that are in the complaint itself. The so-called FTN survey that we looked at a few moments ago, Your Honor, also has no allegation of any change in practice by Aetna. And, in fact, if you look at the actual survey comments one more time, first it refers to the number of people they survey at the beginning. But the section that refers to the so-called competitive comparison is two pages later at page A375 of the appendix, Your Honor. And it starts out anecdotal competitive comparisons, suggesting that they're not claiming 120 people even said this. This is what they heard from some of the people. We don't know how many. And what they heard is that compared to the other insurance companies, Aetna was most often cited as buying business or underpricing for market share by comparison to the other insurers. Now, one of the key questions is that does that mean that they're buying good business or bad business? The allegation here from the plaintiffs is that they were taking bad business and that affected their market. And if you look at the next statement in the survey that the plaintiffs have not been paying the court's attention to, which I would, the survey reports, the brokers reported that another carrier, UnitedHealth and Aetna, were picking low-risk business in the New York tri-state area and practicing good medical underwriting. That's not bad business practice. That's the very opposite in the survey. Is that on A375? A375, about two-thirds of the way down the page. You see the four bullet points? I see. And then it goes on to say this. Whereas respondents suggested that Empire Blue Cross Blue Shield of New York, well choice, is increasing membership in all demographic groups. And then you'll see this. I'll pause. Sorry, Your Honor. Go ahead. Then it refers, and this is talking about another carrier now, potentially not picking business well. So what the survey says is Aetna looks like it's picking up good low-risk business in New York and another carrier looks like they're picking up bad-risk business. And we would say, Your Honor, that would be consistent with the practice Aetna had always followed. And the plaintiffs themselves have no issue with Aetna's practices in the past, which had done very well for its shareholders. And the fact that a company that has the fine track record it had in this regard goes through a period, and it's only two quarters, I would remind this Court, the first two quarters in 2006, where the medical costs are running a little higher than it had projected and it looks like it does not have medical costs under control, that it's only because of that window, which is a specific risk Aetna warned pointedly about as a cautionary statement, that the plaintiffs are now trying to sue Aetna. If Aetna had, in fact, been underpricing in order to get more business, would there be something wrong with that? No. Would that violate? I mean, as I read the Supreme Court's decisions in the antitrust cases, they would say that was good competition. But I don't know enough about insurance. Let's assume that the plaintiffs are right and that Aetna was underpricing because it wanted to get more business. What would that violate? It wouldn't violate anything. Then plaintiffs would say, but you have to tell the market that so that investors could take that into consideration because it would affect your profit margin. Your Honor is exactly right. But remember, Your Honor, underpricing means it's defined. It's defined in paragraphs 3 and 5 of the complaint. It's defined at page 10 of Appellant's brief. Appellants themselves define it as pricing premiums for the future lower than your projected costs. That's the definition we must work with. Now, one might step back and say- That's paragraph 3 and 5? 3 and 5 of the complaint and also page 10 of Appellant's brief. Now, I want to hit one other point quickly because I represent- No, no. Go ahead. I'm sorry. Because I represent the individuals as well. There are four individuals, executives, including the current CEO, who are also named defendants in this suit. This suit, I may remind Your Honor, the plaintiffs are suing potentially for $9 billion in this case. Chairman Williams, who is allegedly the architect of the scheme, traded not a single share of stock, didn't sell a single share of his stock, probably lost $100 million in the first two quarters as the stock price went down along with everyone else. The record of cases- The red light is on. I don't know how you want me- We haven't stopped you. Thank you, Your Honor. The precedents of this court are very clear and very strong in saying if a CEO is invested in the company and is not selling out of a company, especially here where the alleged scheme, Your Honor, would only work for a quarter or two, the premise of the plaintiff's case is that you would underprice and you would pump up your stock for maybe one or two quarters because, of course, by next year we'll know how your overall results are. And two points to make here, Your Honor. One, there's no allegation that for the full year 2006, Aetna's results were not on target. There's no allegation in this case even as to that. It's only these two quarters. I'm sorry. Please. Finish that sentence. There's no allegation. I defer. Go ahead, Your Honor. I've lost track of what I was going to say anyway. Did Aetna decrease its premiums at any time at issue here? There's nothing in the record alleged that would show you that. And with this product, because it's always based on your forecast for medical costs, it's very hard to know, since those costs haven't come yet, whether your premiums are up or down. However, if you look at the survey that we've looked at, the FTN survey, it does note that what was happening in the market about this time was a lot of employers were buying down insurance coverage. They were opting for cheaper insurance coverage in the marketplace. That's what is in the record so far. So I'm not in a position to answer that. So you're saying that the record would show that it decreased its premiums? No, I'm saying that you can't – the record that this Court has in front of it doesn't enable this Court, and there's no allegation that would suffice to draw an inference one way or the other. And I would come back to ICBAR and Tell Labs, lest there be any frustration with my not being a good lawyer for Aetna and having all the facts at hand. I'm here in the role now, post-ICBAR and post-Tell Labs, of saying the plaintiff has to come forward with the particularized facts that substantiate their claim enough so that it supports a strong inference of actual knowledge and fraud on the part of people like the CEO, Williams, who didn't sell a single share of his stock. And there's nothing like that. So may I say 10 seconds to wrap up? The only last point is District Judge O'Neill wrote a 48-page opinion here, clearly spent a lot of time with this case, and we think it was very well decided. Thank you again, Your Honor. Thank you. We'll hear the rebuttal. Greg, how much did he say? Three minutes? Three minutes, Your Honor. I'll be brief. Let me ask you a question because he raised that and you didn't discuss it. Let's talk about the individuals. What evidence do you have of actual knowledge by the individual defendants other than some of them sold their stock but not all of them sold their stock? Well, Your Honor, I can answer that in two different ways. One, when you're saying actual knowledge, if the Court believes that the statements were not forward-looking statements, then, as Mr. Carroll said, we don't have to show actual knowledge. We just have to show recklessness on the part of the individual defendants. Okay. And what evidence do you have of recklessness? There's a couple of different pieces of evidence, Your Honor. First, you have the ---- I mean, you do have to show scienter, right? You have to show scienter, and it's a recklessness standard. So basically what you have is you have the CWs, you have the FTN survey. The CWs talk about the individual defendants right now. Right. Well, you have to put all this information together. If I can sort of kind of gather it for you and then bring it all together, I think that would help because you have to look at, you know, the defendants like to look at each piece of information separately and attack each piece of information separately. What you have to do is look at all the information. So if you look at the FTN survey, you look at the CWs, you look at the insider trading. As Mr. Carroll suggested, one of the four individual defendants did not sell. Three of them did. And actually the CFO who would be privy to the financial information, you know, with regard to the underpricing and the profitability of the company, he sells 46% of his stock. And the three total is like $61 million. So it's not a couple million dollars. I mean $61 million is a significant amount of sales. So you add the insider selling. You have the FTN survey. You have the CWs. Then what you have to add, and this was in the Avaya case, which the court there addressed was this core operation argument that at the core of Aetna is selling insurance policies. So at the core of Aetna selling insurance policies is pricing those policies. And, therefore, if there was underpricing of the policies going on in Aetna on a company basis, then under the core operations doctrine, as suggested in Avaya, those individual defendants at least should have known, which qualifies for recklessness. Now you're right. We haven't suggested that they knew. There's no witness that says, hey, I spoke with the CEO and he said X, Y, and Z. We don't have that. But we suggest, and I pick up what Judge Tashima said, because when he asked Mr. Carroll during his questioning about the statements and whether they were forward-looking statements or not, I did not hear Mr. Carroll give a very direct answer because the question was if they're underpricing and at the same time they're saying they're practicing disciplined pricing, isn't that, in fact, a statement of present tense? And we suggest it is. Well, if disciplined pricing is a fraction of the premiums and the projected medical costs, isn't it by its very nature a future thing? Because you don't know what the medical costs have been going up consistently. That's a very good question, and I think that's what Judge O'Neill struggled with a little bit in the lower court. But if you really peel it back. But he came out against it. Exactly. But if you really pull it back, and I think this is where he went wrong, when they're pricing a policy, when Aetna's pricing a policy, they're basing it on historical costs that are associated with that policy. If they know their historical costs associated with that policy, and just take, for example, are $100, and then they go and sell that policy for $80, then from the outset that policy will probably not be profitable. And it could even be less profitable if the costs are even more. That's very useful. Thank you. So what you're telling us, I think, is that if an examination shows that they set their premiums at a price below their historical costs, that would show underpricing? Exactly. And have you shown that? We believe we have in the complaint, Your Honor. You've shown that they priced their premiums below the – where exactly do you say that in the complaint? Again, it's a combination of different things, but it's a combination of the FTN survey. It's a combination of the CW's testimony. It's a combination of the company gaining over almost close to 600,000 members and then reporting an MCR number that's significantly higher. I think it would be very simple to put in a complaint they priced their premiums at a price that was below their historical costs.  No, no. You said when I asked you where you said that, you said you have to put this together with this together with this. I mean, I've written complaints in my time long ago, but that's a simple thing. You never actually said that in the complaint, did you? I think we did, Your Honor. I think we did, Your Honor. But back up for that statement that Aetna was underpricing and low-buying their premiums is those X, Y, and Z factors. That's what I'm saying. Tell me – why don't you answer the same question that I asked before, Mr. Carroll. What's wrong with underpricing premiums in order to get more business? I guess nothing is – What does it violate? Where it violates the laws, the securities laws here, is because you're telling the public that you're adhering to a certain pricing discipline. And, in fact, if you're underpricing, you're not adhering to that discipline pricing strategies. In itself, you're right, in itself, if a company wants to underprice their policies, God bless them. What Supreme Court would say is competition, I think. Yeah, they're not going to be a profitable company if they're going to underprice their policies. No shareholder wants to invest in a non-profitable company. And that's what we suggest here. When the public found out that this company might not be as profitable as they were saying because of the underpricing, look what happens to the stock. It goes down. Okay. Molly, anything more? Okay. Thank you very much for your time. Thank you. I'm sure that Judge Roth would have had more to ask, but we can't get her. But she'll, as I said before, we'll send her the disk. Thank you very much, Your Honor. Thank you. Thank you. Let's see, you both have to travel to get here, I gather. I think it was easier getting down here yesterday than it may be today, but we'll see. Really? Wow. Thank you, Your Honor. Thank you. Thank you. Okay. We'll hear the third case.